UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Frankfort)

| | | |
|---|---|---|
| APPALACHIAN REGIONAL HEALTHCARE, INC., et al., | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 3: 12-026-DCR |
| V. | ) ) | |
| KENTUCKY SPIRIT HEALTH PLAN, INC., et al., | ) ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of Plaintiffs Appalachian Regional Healthcare, Inc. and ARH Mary Breckenridge Health Services, Inc.'s (collectively, "ARH") motion to remand this case to the Franklin Circuit Court.  [Record No. 18]  For the reasons explained below, the  motion will be granted and the case will be returned to state court for further proceedings.

I.

On April 12, 2012, ARH commenced this action in the Franklin County Circuit Court against Defendants Kentucky Spirit Health Plan, Inc. ("Kentucky Spirit"), and the Cabinet for Health and Family Services, and Audrey Tayse Haynes,[1] in her official capacity as Secretary of

---

1 Audrey Tayse Haynes is the successor to Defendant Eric Friedlander, who was originally named in ARH's Complaint in his official capacity as the former Interim Secretary of the Commonwealth of Kentucky, Cabinet for Health and Family Services. Pursuant to Federal Rule of Civil Procedure 25(d), Haynes was substituted for Friedlander upon her appointment as Cabinet Secretary, effective April 16, 2012.  [Record No. 23, p. 1]

Cabinet for Health and Family Services (collectively, "the Cabinet"). [Record No. 1-2, p. 2] The plaintiffs allege that the underlying case is an "action to recover damages caused by Defendants' failure to pay for Medicaid services as required by law as well as for declaratory and injunctive relief to prevent further violations of the law." [*Id.*, p. 3]

ARH are not-for-profit, tax exempt Kentucky corporations, which have been Kentucky Medicaid providers in good standing for many years. [*Id.*, p. 3, 13] ARH operate eight acute care hospitals in southeastern Kentucky in addition to numerous physician practices, rural health clinics, diagnostic services, home health agencies, and other services. [*Id.,* p. 3] The Cabinet is tasked with the responsibility of administering the Kentucky Medical Assistance Program ("KMAP") pursuant to K.R.S. §§ 205.510–205.630. The Cabinet is also responsible for implementing the federal Medicaid program in the Commonwealth in accordance with Title XIX of the Social Security Act, Kentucky's state Medicaid plan, and other applicable regulations. *See* K.R.S. §§ 205.510-205.603. Kentucky Spirit is a private, for-profit, insurance company that acts as one of Kentucky's three managed care organizations.

### A.     Medicaid Act & State Program

Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v, ("the Medicaid Act"), provides for the establishment of the Medicaid program. *See also* 42 C.F.R. §§ 430.0, 430.10-20. Medicaid is a collaborative federal-state program to assist the poor, elderly, and disabled in obtaining medical care. Under the Medicaid Act, the federal government provides financial support to states that establish and administer state Medicaid programs ("State Plan").[2] *See* 42

---

2 "The State plan is a comprehensive written statement submitted by the agency describing the nature and scope of its Medicaid program and giving assurance that it will be administered in conformity with the

C.F.R. § 430, subpt. B. A state's participation in Medicaid is voluntary; however, a participating state must first have its State Plan approved by the United States Department Health and Human Services ("HHS") before it may receive funding from the federal government. *See* 42 U.S.C. § 1396a(a)-(b); 42 C.F.R. § 430, subpt. B. A prerequisite to gaining HHS approval of a state plan is that the program have a method for reimbursing health care providers who provide services to Medicaid patients.[3] *See* 42 U.S.C. §§ 1396a(a), 1396d(a); *see also* Record No. 23, p. 2. The Commonwealth's KMAP State Plan was established in accordance with these procedures and has gained HHS approval.

Section 1396a(a)(23) of Medicaid Act, commonly referred to as the "freedom-of-choice" provision, requires that beneficiaries be permitted to receive covered healthcare services from any qualified provider. Under this scheme, the states pay these providers on a fee-for-service basis as set by state-established fee schedules. 42 U.S.C. § 1396a(a)(30)(A). States, however, may obtain a "waiver" under 42 U.S.C. § 1315 (commonly referred to as a "1115 Waiver"), which allows states to contract with managed care organizations ("MCOs") to administer the state's Medicaid program on its behalf.[4] *See* 42 C.F.R. § 430.25.[5]

---

specific requirements of title XIX, the regulations in this Chapter IV, and other applicable official issuances of the Department. The State plan contains all information necessary for [Centers for Medicare & Medical Services ("CMS")] to determine whether the plan can be approved to serve as a basis for Federal financial participation (FFP) in the State program." 42 C.F.R. § 430.10.

3  As noted by the Cabinet, "[F]ederal funding for expenditures typically can range from 50%-83%, with higher funding going to States with lower per capita incomes, a feature designed to ensure that Federal funds flow to States with the greatest need. In recent years, however, the costs of the program have soared and the program has expanded as eligibility has increased. Consequently, Congress and State governments have instituted comprehensive changes designed to improve efficiency and save costs." [Record No. 23, p. 2]

4  Before a state may obtain a 1115 Waiver, the state must first gain approval of its plan from the Center for Medicare & Medicaid Services ("CMS"). CMS is the agency which HHS has assigned the responsibility and authority to review and determine States' waiver requests. *See* 42 C.F.R. § 430.25(f). CMS is also tasked

Under such systems, MCOs enter into contracts with the state to provide healthcare services to Medicaid beneficiaries in return for capitated rates.[6]  MCOs enroll Medicaid beneficiaries as "members" in their respective health plans.  These MCOs then contract with providers to supply and administer care to their members.  The providers make up that MCO's provider network.  The MCOs then direct their members to the providers in their network and, in exchange, the in-network providers usually provide healthcare services at a negotiated discount rate, as agreed to by the MCO and provider.  The terms and provisions of these managed care contracts between MCOs and providers are negotiated within the larger federal and state statutory Medicaid framework, and normally incorporate by reference a number of these statutes and regulations.  The MCOs pay these providers directly for their services. [Record No. 1-2, p. 4]  Under a managed care system, members are also allowed to receive healthcare services from providers outside their particular MCO in-network provider pool.  These non-contracting providers rendering services to an MCO's members are referred to as "out-of-network" ("OON") providers.

---

with the responsibility of monitoring compliance with the granted waiver in accordance with 42 U.S.C. § 1396n(f).  *See* 42 U.S.C. § 1396n(f)(1) ("The Secretary shall monitor the implementation of waivers granted under this section to assure that the requirements for such waiver are being met and shall, after notice and opportunity for a hearing, terminate any such waiver where he finds noncompliance has occurred.").

5  42 C.F.R. § 430.25(b) states, in part, that the purpose of the waiver provision is to "provide flexibility needed to enable States to try new or different approaches to the efficient and cost-effective delivery of health care services" and to "allow exceptions to State plan requirements and permit a State to implement innovative programs or activities on a time-limited basis, and subject to specific safeguard."  42 C.F.R. § 430.25(b).

6  *See* n. 9 defining "capitated rates."

Kentucky recently gained approval from CMS to run its Medicaid program as a managed care system and, on November 1, 2011, the Commonwealth transitioned to such a system.[7] [Record No. 1-2, p. 5]  Thereafter, the Cabinet entered into contracts with three insurance companies who now act as MCOs within Kentucky.[8]  Kentucky Spirit is one of the three MCOs that the Cabinet has contracted with to administer the Commonwealth's Medicaid program.  [*Id.*, p. 5]  Under the Commonwealth's managed care system contract with Kentucky Spirit ("MCO Contract"), Kentucky Spirit receives payments for services rendered on a capitated basis.[9]  The MCO Contract contains provisions that set this capitated fee payment scheme and incorporates both federal and state statutory requirements, which dictate the rates Kentucky Spirit will pay its providers and the timeliness of these payments.

Additionally, pursuant to its MCO Contract with the Commonwealth, Kentucky Spirit has entered into contracts with a number of providers.  ARH and Kentucky Spirit entered into negotiations for ARH to become one of Kentucky Spirit's in-network providers; however, the parties were not able to agree on payment rates and other terms.  Thus, ARH are not under contract with Kentucky Spirit and, accordingly, ARH are considered an OON provider by

---

7  To run its Medicaid program as a managed care system, a state must gain CMS approval in accordance with the requirements of 42 U.S.C. § 1396b(m)(2)(A)(iii); 42 C.F.R. §§ 438.86(b) & 438.6. [Record No. 1-2, p. 5]

8  The three MCOs with which the Cabinet has contracted are Defendant Kentucky Spirit; Coventry Health and Life Insurance Co., Inc.; and Wellcare Health Insurance of Illinois d/b/a Wellcare of Kentucky, Inc. [Record No. 1-2, p. 5-6]

9  Kentucky Spirit's MCO Contract defines capitated rates as "the amount(s) to be paid monthly to the Contractor by the Commonwealth for Members enrolled based on such factors as the Member's aid category, age, gender and service."  Additionally, the MCO Contract defines capitated payments as "the total per Member per month amount paid by the Commonwealth to the Contractor, for providing Covered Services to Members enrolled."  [Record No. 22, pp. 7-8 (quoting MCO Contract, Section 2, p. 9)]

Kentucky Spirit.  As an OON provider, ARH continue to provide services to Kentucky Spirit's members.  In accordance with the Emergency Medical Treatment Act ("EMTALA"), 42 U.S.C. § 1395dd, ARH provide emergency services to Kentucky Spirit members.  Additionally, ARH have been pre-authorized by Kentucky Spirit to provide non-emergency services to its members as OON provider.  The framework of rates and scheduled fees Kentucky Spirit is obligated to pay OON providers for healthcare services rendered to its members was agreed upon and provided for in Kentucky Spirit's MCO Contract with the Commonwealth.

### B.    Defendants' Removal of ARH's Complaint

On May 4, 2012, Kentucky Spirit removed this case from Franklin County Circuit Court pursuant to 28 U.S.C. §§ 1331, 1441, and 1446.  [Record No. 1, p. 1]  Three days later, the Cabinet filed its Notice of Consent to Removal [Record No. 5], thus satisfying the "rule of unanimity" of 28 U.S.C. § 1446.  *See Loftis v. United. Parcel Serv., Inc.*, 342 F.3d 509, 516 (6th Cir. 2003).  Following removal, ARH timely filed their motion to remand in accordance with 28 U.S.C. § 1447(c), arguing that federal question jurisdiction is lacking.  [Record No. 18]  Specifically, ARH assert that because diversity of citizenship is not present, and because ARH have asserted only state law causes of action, this Court lacks jurisdiction to hear this case.  [*Id.*]

The defendants argue that the Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1441 "based on the direct claims on the face of the Complaint that Kentucky Spirit has violated various federal statutes and/or regulations, including federal laws requiring prompt payment and establishment of an adequate provider network."  [Record No. 1, p. 6]  Additionally, the defendants allege that federal question jurisdiction is proper under the

"principles set forth in *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg*, 545 U.S. 308 (2005)." [*Id.*]  The defendants contend that ARH's claims "directly raise issues in federal Medicaid law, which determines how the Cabinet may arrive at capitated payments and contract with Managed Care Organizations, including Kentucky Spirit, to provide Medicaid services in Kentucky, how access to such services must be provided throughout the state, [and] how prompt payment for such services must be made, and other issues related to this case." [*Id.*, p. 7 (citing 42 U.S.C. § 1396 *et seq.*)]

ARH, however, assert that this suit has been brought for underpayment and nonpayment of Medicaid claims pursuant to violations of "state Medicaid statutes and state contract law," which they contend are issues that do not involve any substantial federal issues. [Record No. 18-1, p. 2]  Thus, they argue that "the only proper venue for ARH's claims is state court," and that this action should be remanded to the Franklin Circuit Court. [*Id.*]

## II.

A federal courts' removal jurisdiction is established in 28 U.S.C. § 1441, and "[a]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."[10] 28 U.S.C. § 1441(a) (2011).  Where, as here, the parties are not diverse, the appropriateness of removal "turns on whether the case falls within the original 'federal question' jurisdiction of the

---

10  The statutory scheme of 28 U.S.C. § 1441 was amended and revised on December 7, 2011. The parties to this action have incorrectly cited to the previous version of 28 U.S.C. § 1441 in their filings with the Court. [*See* Record Nos. 1, 23.]

United States district courts." *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust*,

463 U.S. 1, 8 (1983).  Thus, when diversity of citizenship is lacking, the Court looks to 28

U.S.C. § 1331, which dictates the parameters of the court's federal-question jurisdiction.  28

U.S.C. § 1331.  Section 1331 states that "[t]he district courts shall have original jurisdiction of

all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C.

§ 1331.  In other words, cases are properly removed when they "arise under" federal law — or,

when original federal-question jurisdiction would be proper.  *Id.*

The Supreme Court has explained that a district court's federal-question jurisdiction is

limited to cases "in which a well-pleaded complaint establishes either that federal law creates

the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a

substantial question of federal law."  *Franchise Tax*, 463 U.S. at 27–28.  A case depends on the

resolution of a substantial question of federal law when "the federal law is a necessary element

of one of the well-pleaded . . . claims."  *Id.* at 13.  Additionally, under the "well-pleaded

complaint" rule, courts will generally only look to the plaintiff's complaint.  *Palkow v. CSX

Transp., Inc.*, 431 F.3d 543, 552 (6th Cir. 2005).  Therefore, absent diversity, in deciding

whether a district court has subject matter jurisdiction over the claims of a party, the Court

applies the well-pleaded complaint rule.  *See Franchise Tax*, 463 U.S. at 13.  However, as

jurisprudence has evolved in this area of law, few very narrow exceptions to this rule have been

carved out. The Sixth Circuit examined these exceptions in *Mikulski v. Centerior Energy Corp.*,

and opined that

> One exception is the artful-pleading doctrine: plaintiffs may not "avoid removal
> jurisdiction by artfully casting their essentially federal law claims as state-law

-8-

> claims." A related exception is the complete-preemption doctrine: removal is proper "when a federal statute wholly displaces the state-law cause of action through complete pre-emption." A third exception is the substantial-federal-question doctrine, which applies "where the vindication of a right under state law necessarily turn[s] on some construction of federal law."

501 F.3d 555, 565 (6th Cir. 2007) (citations omitted).  Under these limited circumstances, a defendant may properly remove an action to federal court despite a plaintiff's desire to proceed in state court.

"[I]n certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues." *Grable & Sons Metal*, 545 U.S. at 312.  However, "[t]he well-pleaded complaint rule generally provides that the plaintiff is the master of his complaint, and the fact that the wrong asserted could be addressed under either state law or federal law does not ordinarily diminish the plaintiff's right to choose a state law cause of action." *Alexander v. Elec. Data Sys. Corp.*, 13 F.3d 940, 943 (6th Cir. 1994).  Therefore, a plaintiff is allowed to pursue a state law cause of action even when federal law may provide the plaintiff an alternative remedy.  *See id.*  It is the party seeking removal who "bears the burden of demonstrating that the district court has original jurisdiction," and not the responsibility of the plaintiff.  *Eastman v. Marine Mech. Corp.*, 438 F.3d 544, 549 (6th Cir. 2006).  Thus, the defendant must prove the propriety of removal by demonstrating that the case, as pleaded by the plaintiff, falls under the original jurisdiction of the Court.  *Id.*  "Further, because they implicate federalism concerns, removal statutes are to be narrowly construed." *Long v. Bando Mfg. of Am., Inc.*, 201 F.3d 754, 757 (6th Cir. 2000).

## III.

ARH's Complaint consists of seven counts which allege violations of Kentucky state Prompt Pay statutes; breach of contract by the defendants; bad faith; unjust enrichment; and violation of Kentucky's Medicaid rate statute.  ARH assert that all counts of their Complaint are based only on Kentucky state Medicaid statutes and state contract law, and that these claims do not involve any substantial federal issue.  [Record No. 18-1, p. 2]  ARH argue that they have not asserted any private right of action established by federal law in their Complaint. [*Id.*, p. 11] However, the defendants contend that "the claims raised on the face of ARH's Complaint establish substantial federal questions," and that removal to federal court is appropriate.  [Record No. 22, p. 20]

### A.    Prompt Pay Violations

For CMS to grant approval of a State Plan and a Waiver to operate as a managed care system, the State Plan must provide for certain provisions regarding the timeliness of payment of claims.  *See, e.g.,* 42 U.S.C. §§ 1396(b)(4), 1396u-2(f).  Specifically, Section 1396a(a)(37)(A) of Title 42, commonly referred to as the federal "Prompt Pay" statute, delineates claim payment procedures by state Medicaid plans.  It requires that the state Medicaid plan must provide for claims payment procedures that

> ensure that 90 per centum of claims for payment (for which no further written information or substantiation is required in order to make payment) made for services covered under the plan and furnished by health care practitioners through individual or group practices or through shared health facilities are paid within 30 days of the date of receipt of such claims and that 99 per centum of such claims are paid within 90 days of the date of receipt of such claims . . .

-10-

42 U.S.C. § 1396a(a)(37)(A). Thus, to gain approval by CMS, a State Plan must require its MCOs to pay out claims on this basis.

Although the federal Prompt Pay statute delineates the general framework of claim payment by state Medicaid plans, states are free to implement their own Prompt Pay statutes as long as they are within the framework of the federal Prompt Pay statute. Kentucky has a number of its own state Prompt Pay statutes. *See* K.R.S. §§ 304.17A-700 to 304.17A-730, 205.593, 304.14-135, §304.99-123. ARH allege that Kentucky Spirit is both statutorily and contractually bound to abide by these state Prompt Pay statutes pursuant to K.R.S. §§ 304.17A-005 & 3044.17A-700 and Section 29.1 of Kentucky Spirit's MCO Contract.[11] [Record No. 1-2, pp. 7-8] Section 29.1 of Kentucky Spirit's MCO Contract states:

> In accordance with the Balanced Budget Act (BBA) Section 4708, the Contractor shall implement Claims payment procedures that ensure 90% of all Provider Claims for which no further written information or substantiation is required in order to make payment are paid or denied within thirty (30) days of the date of receipt of such Claims and that 99% of all Claims are processed within ninety (90) days of the date of receipt of such Claims. In addition, the Contractor shall comply with the Prompt-Pay statute, codified within KRS 304.17A-700-730, as may be amended, and KRS 265.593, and KRS 304.14-135 and 99-123, as may be amended.
>
> The Contractor shall notify the requesting provider of any decision to deny a claim, or to authorize a service in an amount, direction, or scope that is less than requested. The notice to the provider need not be in writing.
>
> Any conflict between the BBA and Commonwealth law will default to the BBA unless the Commonwealth requirements are stricter.

[Record No. 1-2, pp. 7-8]

---

11  ARH represent that these same Prompt Pay requirements were also incorporated in the "Cabinet's emergency regulation, 907 KAR 17:005E, Section 56, promulgated to implement the Waiver." [Record No. 1-2, p. 8]

ARH contend that the requirements of Kentucky's Prompt Pay statutes are stricter than those of the BBA. [*Id.*, pp. 8-9]  Section 304.17A-702 of the Kentucky Revised Statutes requires that Kentucky Spirit reimburse its providers for a "clean claim" or, in the alternative, send notice to the provider denying the claim within thirty days from when the claim is received by Kentucky Spirit.[12]  [*Id.*]  ARH further assert that Kentucky Spirit is required to timely notify ARH of any information missing from claims submitted or billing errors that Kentucky Spirit

---

12  Section 304.17A-702 of K.R.S., titled Claims payment time frames – Duties of insurer, states:

(1) Except for claims involving organ transplants, each insurer shall reimburse a provider for a clean claim or send a written or an electronic notice denying or contesting the claim within thirty (30) calendar days from the date that the claim is received by the insurer or any entity that administers or processes claims on behalf of the insurer. Clean claims involving organ transplants shall be paid, denied, or contested within sixty (60) calendar days from the date that the claim is received by the insurer or any entity that administers or processes claims on behalf of the insurer.

(2) Within the applicable claims payment time frame, an insurer shall:

(a) Pay the total amount of the claim in accordance with any contract between the insurer and the provider;

(b) Pay the portion of the claim that is not in dispute and notify the provider, in writing or electronically, of the reasons the remaining portion of the claim will not be paid; or

(c) Notify the provider, in writing or electronically, of the reasons no part of the claim will be paid.

Ky. Rev. Stat. Ann. § 304.17A-702.

contends precludes claims from being "clean claims" pursuant to K.R.S. § 304.17A-704(1).[13]

[*Id.*, pp. 9, 16]

Kentucky Spirit, however, argues that proof that it violated the federal Prompt Pay provisions of 42 U.S.C. §§ 1396a(a)(37)(A), 1396n(b)(4), and 1396u-2(f) is an essential element of Plaintiffs' claims.  [Record No. 1, p. 8]  It contends that because plaintiffs' claims "regarding the federal Prompt Pay laws necessarily involve[] substantial federal questions, this Court has federal question jurisdiction over plaintiffs' claims under 42 U.S.C. § 1331."  [*Id.*, p. 8-9]

### B.   Payment of OON Providers

---

13  Section 304.17A-704(1) of K.R.S., titled Insurer's acknowledgment of receipt of claim – Inaccurate or insufficient claim information – Claim status information, states:

(1) (a) Within forty-eight (48) hours of receiving an original or corrected claim submitted electronically, an insurer, its agent, or designee shall acknowledge the date of receipt of the claim by an electronic transmission to the provider, its billing agent, or designee that submitted the claim; and

(b) Within twenty (20) calendar days of receipt of an original or corrected claim submitted by mail or other nonelectronic means, an insurer, its agent, or designee shall acknowledge the date of receipt of the claim to the provider, its billing agent, or designee that submitted the claim.

1. For claims containing all necessary information and having no errors, the insurer shall make available confirmation of receipt of the claim to the provider, its billing agent, or designee that submitted the claim. Acknowledgment may be in writing or the insurer, its agent, or designee may list the claim and the date it was received on a file that can be accessed electronically by the provider, its agent, or designee.

2. Claims that contain errors or lack necessary information shall be acknowledged by an electronic transmission or in writing to the provider, its billing agent, or designee that submitted the claim.

Ky. Rev. Stat. Ann. § 304.17A-704(1).

-13-

Kentucky Spirit's MCO contract with the Commonwealth provides for payment rates that Kentucky Spirit is obligated to pay to OON providers for services rendered to its members.[14] Specifically Section 29.2 of the MCO Contract, titled "Payment to Out-of-Network Providers" states, in part:

> Covered Services shall be reimbursed at no less than 100 percent of the Medicaid fee schedule/rate until January 1, 2012 and after January 1, 2012, no less than 90% of the Medicaid fee/schedule rate.  Covered services except for emergency services provided to a Member from an Out-of-Network Provider that has not sought Prior Authorization within thirty (30) days need not be reimbursed.

[Record 1-2, p. 12]  Thus, the fees which Kentucky Spirit is required to pay to OON providers are explicitly provided for in Section 29.2 of Kentucky Spirit's MCO Contract.

ARH allege in their Complaint that the Medicaid rates referenced within Section 29.2 are set by the Cabinet pursuant to certain provisions of the Kentucky Administrative Regulations. [Record No. 1-2, p. 12]  For instance, the Medicaid rates for emergency room services are set by the Cabinet in accordance with Rule 10:015 of Title 907 of Kentucky Administrative Regulations ("KAR"); laboratory services are reimbursed in accordance with 907 KAR 1:029; and all other emergency services are reimbursed "according to regulation on an interim basis at ninety-five percent of the hospital's specific, outpatient cost-to-charge ratio based on the hospital's most recently file cost report and then settled to ninety-five percent of actual cost at year end," in accordance with 907 KAR 10:015, Section 2. [*Id.*]  ARH claim that Kentucky

---

14  The basic framework and rate requirements that an MCO is required to pay is set out in 42 C.F.R. § 438.6(c).  This provision, titled Requirements for actuarially sounds rates, states in part: "[i]n setting actuarially sound capitation rates, the State must apply the following elements, or explain why they are not applicable . . .," and then goes on to list a number of factors.  *See* 42 C.F.R. § 438.6(c).  A state is allowed to work within this framework in setting its agreed upon rates.

Spirit, however, has violated the payment scheme as provided for in Kentucky Spirit's MCO Contract, and by certain Rules of Title 907 of the Kentucky Administrative Regulations.  [*Id.*]

Additionally, ARH allege that the Cabinet is liable to the plaintiffs for medical services they have rendered to Kentucky Medicaid beneficiaries.  They assert that the Cabinet is supposed to reimburse hospitals for "hospital care . . . [on] bases which relate the amount of the payment to the cost of providing services or supplies," pursuant to K.R.S. § 205.560(2).  [Record No. 1-2, p. 13]  ARH argue that the Cabinet has failed to comply with this requirement since 2007.  [*Id.*] Specifically, they assert that the Cabinet has failed

> to reimburse ARH for inpatient, acute care services on any basis which relates the amount of the payment to the cost of providing services and supplies.  Instead, in designing its diagnosis related group ("DRG") methodology effective October 15, 2007, the Cabinet first designed a methodology similar to the DRG methodology employed by CMS for Medicare reimbursement.  After the Cabinet modeled what that methodology would pay it then arbitrarily applied a "budget neutrality factor" to its DRG methodology to reduce expected payments by approximately twenty percent.

[Record No. 1-2, p. 12]  Further, ARH allege that the Cabinet has failed to abide by the administrative remedies set by Kentucky statute and regulation for hearing and determining rate disputes established by 907 KAR 1:671, Section 8.  [*Id.*, pp.14-15]

## C.  **Substantial Federal Question**

Thus, resolution of the motion to remand is centered on whether ARH's claims necessarily raise a substantial question of federal law.  The applicable test is whether "the federal law is a necessary element of one of the well-pleaded . . . claims."  *Franchise Tax*, 463 U.S. at 13.  More specifically, the Court must determine whether references to federal statutes within ARH's Complaint are actually elements of its "well-pleaded" claims and whether any question

of federal law is necessary to those claims. "The substantial-federal-question doctrine has three parts: (1) the state-law claim must necessarily raise a disputed federal issue; (2) the federal interest in the issue must be substantial; and (3) the exercise of jurisdiction must not disturb any congressionally approved balance of federal and state judicial responsibilities." *Mikulski*, 501 F.3d at 569 (citing *Grable & Sons*, 545 U.S. at 314).

Under the well-pleaded complaint rule, whether a claim raises a question of federal law "must be determined from what necessarily appears in the plaintiff's statement of his own claim in the [complaint], unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose." *Franchise Tax*, 463 U.S. at 10 (quoting *Taylor v. Anderson*, 234 U.S. 74, 75-76 (1914)). Therefore, a claim which gives rise to a federal defense does not, for that reason alone, raise a substantial question of federal law, "even if the defense is anticipated in the plaintiff's complaint, and even if both parties admit that the defense is the only question truly at issue in the case." *Id.* at 14; *see also Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6 (2003) ("To determine whether the claim arises under federal law, we examine the 'well pleaded' allegations of the complaint and ignore potential defenses . . . [even] a defense that relies on the . . . pre-emptive effect of a federal statue will not provide a basis for removal.").

Additionally, "the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." *Merrell Dow Pharm., Inc. v. Thompson*, 478 U.S. 804, 813 (1986); *see also Gully v. First Nat'l Bank*, 299 U.S. 109, 115 (1936) ("Not every question of federal law emerging in a suit is proof that a federal law is the basis of the suit."); *Mikulski v. Centerior Energy Corp.*, 501 F.3d 555, 565 (6th Cir. 2007) ("The mere presence of

-16-

a federal issue in a state law cause of action does not automatically confer federal question jurisdiction, either originally or on removal.  Such jurisdiction remains exceptional and federal courts must determine its availability, issue by issue.").  Thus, federal question jurisdiction is proper when a state law claim depends on the adjudication of a federal issue; however, this "demands not only a contested federal issue, but a substantial one, indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum."  *Grable & Sons,* 545 U.S. at 313.

### 1.    ARH's Complaint Does Not Raise Any Disputed Federal Issue.

Kentucky Spirit argues that its alleged failure to comply with the federal Prompt Pay provisions is an essential element of ARH's claims and requested relief, and that these claims depend upon proof that Kentucky Spirit violated the federal Prompt Pay provisions in 42 U.S.C. §§ 1396a(a)(37)(A), 1396n(b)(4) & 1396u-2(f).  [Record No. 1, p. 8; *see also* Record No. 23, p. 9] The defendants argue that ARH's citation to these federal statutes in paragraphs 13-15 of their Complaint is tantamount to ARH asserting claims pursuant to these specific federal statutes. [Record No. 1, p. 8; Record No. 23, p. 8]

ARH's Complaint lays out a detailed explanation of the background facts of this case, including the statutory framework — consisting of both federal and state statutes and regulations — which comprise the Medicaid system, Kentucky's managed care system, and a number of contract provisions from the Kentucky Spirit's MCO Contract with the Commonwealth.  [Record No. 1-2, pp. 3-16]  In fact, roughly fourteen pages of ARH's twenty-page Complaint consists of background information and facts before Count I of the Complaint is stated, and each Count of

-17-

ARH's Complaint incorporates by reference all the preceding paragraphs to that Count, as is standard drafting practice.  [Record No. 1-2, pp. 3-16]

The specific counts of ARH's Complaint, however, only cite — with specificity — violations of Kentucky's Prompt Pay state statutes and Kentucky regulations regarding the payment rates for OON providers.  Additionally, a number of counts of ARH's Complaint are premised on principles of Kentucky contract law (*i.e.*, theories of unjust enrichment; allegations that ARH are a third party beneficiary to Kentucky Spirit's MCO Contract; and breach of duties of good faith and fair dealing).  [*Id.*, pp. 16-23]  In short, ARH's citation to federal statutes in the background section of their Complaint appears to be an attempt to more fully-explain the organization of Kentucky's Medicaid system, as opposed to making allegations which would confer federal jurisdiction over their claims.  *See Michigan So. R.R. Co. v. Branch & St. Joseph Cntys. Users Ass'n, Inc.*, 287 F.3d 568, 574 (6th Cir. 2002) (the "mere reference to a federal statute does not establish federal jurisdiction unless a substantial, disputed question of federal law is a necessary element of a state cause of action").

For instance, Count I of ARH's Complaint alleges that Kentucky Spirit has violated K.R.S. § 304.17A; that "Kentucky Spirit has consistently failed or refused to pay ARH's claims promptly on a timely basis as required by state Prompt Pay statutes;" that "Kentucky Spirit, through its violations of state Prompt Pay statutes, has caused monetary damages to ARH;" and that "under KRS 446.070, ARH [are] entitled to recover the damages [they have] sustained by reason of Kentucky Spirit's violations of the Prompt Pay Statutes."  [Record No. 1-2, pp. 16-17]

-18-

Counts II-V are also based upon Kentucky Spirit's alleged failure to comply with Kentucky's Prompt Pay statutes and statutorily set rate payments, and theories of Kentucky state contract law. Specifically, Count II alleges breach of contract and makes claims that ARH are a third party beneficiary to Kentucky Spirit's MCO Contract; Count III seeks declaratory and injunctive relief based upon these breaches; Count IV alleges that Kentucky Spirit acted in bad faith in the extent it had discretion in deciding whether or not claims submitted to it by ARH would be considered "clean claims," thus violating contract theories of good faith and fair dealing; Count V is based upon the contract theory of unjust enrichment. As noted above, Kentucky Spirit's MCO Contract with the Commonwealth specifically subjects Kentucky Spirit to Kentucky's Prompt Pay statutes, along with state law provisions regarding the fees paid to OON providers. [Record No. 1-2, pp. 6-9, 11-15]

The last two counts of ARH's Complaint are based upon alleged breaches of contract and violations of state statutes by the Cabinet. Count VI specifically alleges that the DRG rates which the Cabinet has paid ARH are in violation of K.R.S. § 205.560(2). Likewise, Count VII is predicated on alleged violations of Kentucky contract law, and charges that the Cabinet is liable for reimbursing ARH for any of Kentucky Spirit's violations or breaches, pursuant to statute and the Cabinet's provider agreement with ARH. In fact, in its motion for summary judgment, the Cabinet acknowledges that both Counts VI & VII are based upon contract law, and argue that "[c]ounts VI and VII are claims for breach of contract and must fail."

In summary, ARH's claims arise from alleged violations of (1) Kentucky's Prompt Pay statute, K.R.S. §§ 304.17A-700 – 730; (2) Kentucky's Medicaid payment rate statute, K.R.S. §

-19-

205.560(2); and (3) both express and implied contract provisions.  These claims are creatures of state law.  Additionally, to the extent that federal Medicaid law is implicated in the statutory framework in which Kentucky's Medicaid program operates, this is insufficient to trigger the "arising under" door of federal question jurisdiction.  *See PriemierTox, Inc. v. Ky. Spirit Health Plan, Inc.*, 2012 U.S. Dist. LEXIS 74672, at *17-18 (W.D. Ky. May 30, 2012).

### 2.   Federal Interests/Claims Are Not Substantial to ARH's Claims.

To the extent that federal law is implicated by ARH's claims, it is not substantial to the resolution of those claims.  At best, federal law presents either defenses to ARH's state law claims or alternative theories under which ARH might proceed.  *See Grable & Sons*, 545 U.S. at 314.  Case law has established that neither federal defenses alleged by a defendant, nor a counterclaim asserted by a defendant, can serve as the basis for "arising under" federal jurisdiction.  *See Holmes Group Inc. v. Vornado Air Circulation Sys. Inc.*, 535 U.S. 826, 830-32 (2002).

In *Empire Healthcare Assurance, Inc. v. McVeigh*, 547 U.S. 677, 682-83 (2006), the Supreme Court examined a number of factors it considered to determine whether a federal issue was "substantial" in nature, thus satisfying the second prong of the *Grable & Sons* test.  The Court's analysis centered on: (1) whether the dispute was based on the action of federal agency and the agency's actions conformity with a federal statute; (2) whether resolution of a federal issue was controlling of the outcome of case; (3) whether the Court's interpretation of the federal statute would be controlling in numerous of other cases; and (4) whether the federal aspect of the case was a factual issue or "nearly [a] pure issue of law."  *Id*.  Applying these principles, the

Court concludes that ARH's claims do not include a substantial federal issue.  The federal government is not a party to this case; this is a lawsuit between private parties and a state government agency.  Additionally, given the nature of ARH's claims, the Court will not be required to resolve any predominant issue of federal law to reach an outcome in this case.  Further, given the nature of ARH's claims, the Court's inquiry into the merits of ARH's claims will be fact intensive, and not a "pure issue of law."  The presiding court will most likely have to examine each specific allegation of Kentucky Spirit's failure to timely pay or pay the correct rate of a submitted claim.[15]

The Court also notes that the Kentucky's Prompt Pay statutes place more stringent requirements upon an MCO regarding the timeliness of payments than the requirements set forth in the federal Prompt Pay statute.  For instance, Kentucky's Prompt Pay statute requires Kentucky Spirit to reimburse its providers for a "clean claim" or send written or electronic notice denying or contesting the claim within 30 days.  *See* Ky. Rev. Stat. Ann. § 304.17A-702.  In contrast, the federal Prompt Pay statute requires that ninety percent of claims be paid in thirty days, and that ninety-nine percent be paid in ninety days.  *See* 42 U.S.C. § 1396a(a)(37)(A).  A comparison of the plain language of these statutes demonstrates that requirements conferred by Kentucky's Prompt Pay statute are different, and stricter, than those of the federal Prompt Pay statute.  Therefore, this Court's interpretation and application of Kentucky's state Prompt Pay

---

15  ARH have represented that "[a]s of March 19, 2012, ARH [have] 1,609 clean claims with charges totaling $5,871,813 under submission and awaiting for payment by Kentucky Spirit.  Eighty-three percent of those claims have been submitted to Kentucky Spirit for payment for more than thirty days.  Forty-eight percent of those claims have been submitted for payment for more than ninety days." [Record No. 1-2, p. 11]

statute would most likely have very little bearing on the outcome of other cases involving interpretation of the federal statute. *See Empire Healthcare*, 547 U.S. at 682-83.

The fact that federal law provides an alternative theory under which ARH may proceed is not determinative of the Court's analysis. A "claim supported by alternative theories in the complaint may not form the basis for [federal] jurisdiction unless [federal] law is essential to *each* of those theories." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 810 (1988) (emphasis added). In other words, a claim does not *necessarily* raise a question of federal law when it could be supported by a theory that bears no relation to federal law. Both the federal Prompt Pay statute and Kentucky's Prompt Pay statutes place different requirements on the parties and thus allow a plaintiff to seek potential redress under each. ARH have chosen to base their allegations upon infractions of Kentucky's Prompt Pay statutes, and the fact that the federal Prompt Pay statute exists does not automatically confer jurisdiction on this Court. *See Alexander v. Elec. Data Sys. Corp.*, 13 F.3d 940, 943 (6th Cir. 1994).

In its response to the motion to remand, Kentucky Spirit argues that ARH's Complaint "is completely flawed because it is grounded on a fundamental misconception about how payment to Medicaid providers occurs under the new managed care system," and asserts that it is not obligated to reimburse providers in accordance with the DRG methodology that governed the old Medicaid fee-for-service program, which existed prior to the Commonwealth moving to a managed care system. [Record No. 22, p. 3-4] In essence, Kentucky Spirit argues that the Cabinet no longer sets rates in accordance with state administrative regulations or state statutes such as K.R.S. § 205.560(2). [*Id.*, p. 4] Kentucky Spirit's assertion that K.R.S. § 205.560(2)

-22-

no longer applies to it, and that it now sets rates in accordance with 42 C.F.R. § 438.6, cannot be the impetus for the Court finding that it has subject matter jurisdiction. *See Holmes Group Inc.*, 535 U.S. at 830-32. Kentucky Spirit's claim that state regulations and statutes no longer dictate how it sets its reimbursement rates for providers is, at most, a defense to ARH's allegations.

Kentucky Spirit also argues that because ARH "acknowledge[] that [they] perform[] emergency medical services for MCO members as required by the federal Emergency Medical Treatment Act," 42 U.S.C. § 1395dd, and then "complain[] about the rates MCOs pay for those emergency services," is the equivalent of ARH alleging claims under federal law. [Record No. 22, p. 10] Kentucky Spirit contends that ARH "directly implicate[] the federal law and complex regulatory scheme when [they] claim[] that 'Kentucky Spirit is not acting pursuant to any statute or regulation or any other valid authority when it reimburses ARH only ninety percent of the Medicaid rates for emergency services.'" [Record No. 22, p. 11 (citing Record No. 1-2, p. 16)] However, the counts of ARH's Complaint that implicate the rates Kentucky Spirit reimburses ARH for emergency room services are raised in the context of contract claims alleging that Kentucky Spirit breached Section 29.2 of its MCO Contract, which provides for the rates to be paid to OON providers. ARH's Complaint does not implicate any substantial issues of federal law in its claims regarding this issue.

### 3.    Acceptance of Jurisdiction Would be Disruptive.

Under the last prong of the *Grable & Sons* test, accepting jurisdiction over ARH's claims would be disruptive to the sound division of labor between state and federal courts envisioned

by Congress. *See* 545 U.S. at 314.  As discussed above, Congress has allotted states a fair amount of flexibility to implement their own specific state-tailored Medicaid plans. *See, e.g.,* 42 C.F.R. § 430.25 (noting that purpose of the waiver provision is to "provide flexibility needed to enable States to try new or different approaches to the efficient and cost-effective delivery of health care services" and to "allow exceptions to State plan requirements and permit a State to implement innovative programs or activities on a time-limited basis, and subject to specific safeguard").  Additionally, "the fact that Congress provided no private right of action in the Federal Medicaid Act presents compelling evidence that a finding of federal jurisdiction in the instant case would not be 'consistent with congressional judgment about the sound division of labor between state and federal courts.'"  *Hood ex rel. Mississippi v. Ortho-McNeil-Janssen Pharms., Inc.,* No. 08-166, 2009 U.S. Dist. LEXIS 17487, at *8 (N.D. Miss. Mar. 4, 2009) (quoting *Grable & Sons*, 545 U.S. at 313).

Medicaid is the hallmark of "'cooperative Federalism.'" *Hood ex rel. Mississippi v. AstraZeneca Pharms.*, 744 F. Supp. 2d 590, 605 (N.D. Miss. 2010) (quoting *Harris v. McRae*, 448 U.S. 297, 308 (1980)).  It is a program administered jointly by both state and federal governments that directs federal funding to states to assist them in providing healthcare assistance to the elderly and needy.  To the extent that federal law is implicated in ARH's causes of action, state courts are competent to interpret and apply federal law.  *See Mikulski*, 501 F.3d at 560 (citing *Zwickler v. Koota*, 389 U.S. 241, 245 (1967)); *see also Beneficial Nat'l Bank*, 539 U.S. at 21 (Scalia, J., dissenting) ("[I]t is up to Congress, not the federal courts, to decide when the risk of state-court error to a matter of federal law becomes so unbearable as to justify

-24-

divesting the state courts of authority to decide the federal matter.").  Further, this Court agrees that a "finding of federal jurisdiction over any state cause of action implicating provisions of the Federal Medicaid Act and its accompanying regulations could attract a horde of original filings and removal cases raising other state claims with embedded federal issues.  *Hood*, 2009 U.S. Dist. LEXIS 17487, at *3 (internal citations and alterations removed).

### IV.

Because the Court cannot discern any basis to exercise subject matter jurisdiction over this case, and keeping in mind that "[a]ll doubts as to the propriety of removal are resolved in favor of remand," this case will be remanded back to the Franklin Circuit Court.  *See Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 493 (6th Cir. 1999).  Accordingly, it is hereby

**ORDERED** as follows:

1.  The plaintiffs' motion to remand [Record No. 18] is **GRANTED**.  This case shall be **REMANDED** back to the Franklin Circuit Court.

2.  Defendants Commonwealth of Kentucky, Cabinet for Health and Family Services and Eric Friedlander's Motion for Summary Judgment [Record No. 15] is **DENIED**, as moot.

This 17th day of January, 2013.



Signed By:

*Danny C. Reeves*  DCR

United States District Judge